UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

NAHAJEHA DICKERSON

                                       Plaintiff,

                 -against-

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF CORRECTIONS, PRISON HEALTH
SERVICES, INC. (PHS), PHS MEDICAL SERVICES,
P.C., DR. FRANCK LEVEILLE, NEW YORK CITY
CORRECTIONS OFFICER LATISHA FARLEY, Shield #
18331,

                                    Defendants.
---------------------------------------------------------------------- x

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

10 CV 4620 (BMC)

        Plaintiff, Nahajeha Dickerson, submits this statement in response to Defendant's Statement of Facts in support of Defendant's Summary Judgment Motion, pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, setting forth the material facts which she contends are genuine issues of material fact to be tried:

        1.      On October 15, 2009, at approximately 6:05 a.m. plaintiff was arrested for Criminal Possession of a Controlled Substance in the 2nd Degree, Criminal Possession of a Controlled Substance in the 3rd Degree, and Criminal Possession of a Loaded Firearm in the 2nd Degree.  (See Arrest Report, annexed to the declaration of Lisa M. Richardson (hereinafter "Richardson Declaration") as Exhibit "B").  **Plaintiff #1:**  The Plaintiff's arrest was the result of a search warrant at her residence.  All criminal charges against the Plaintiff were dismissed and sealed.  The Plaintiff voluntarily dismissed all claims related to false arrest

2.       On October 17, 2009, plaintiff was admitted into the custody of the New York City Department of Correction.  (See Inmate Inquiry Screen, annexed to Richardson Decl. as Exhibit "C").

3.       In the late hours of October 17, 2009, plaintiff was going through the intake procedure at Rikers Island.  (See Excerpts from the Transcript of the Deposition of Nahajeha Dickerson taken April 15, 2011 (hereinafter "Pl's. Dep."), annexed to Richardson Decl. as Exhibit "D," pp 28:18-29:18).

4.       As a new inmate, plaintiff was required to see a doctor.  (Id. at 28:25-29:18).

5.       When plaintiff arrived in the clinic, there were three other inmates waiting to see the doctor.  (Id. at 32: 16-19).

6.       Plaintiff waited in the clinic for approximately one and a half hours before seeing the doctor.  (Id. at 35:19-24).

7.       At some point while she was waiting, plaintiff heard Dr. Leveille say "send in the next one".  (Id. at 36: 8-16).

8.       At this time, plaintiff was signaled to go see Dr. Leveille.  (Id. at 44:5-9). **Plaintiff's # 8**: Prior to seeing Dr. Leveille a female nurse took the Plaintiff's vitals. (see Pl. Exhibit 1 at page 157, lines 18 to 22, page 158, lines 20 to 23) There are typically two or three female nurses assigned to the clinic. (see Pl. Exh. #2, page 40, lines 22-25, page 41, lines 2 to 8) Corrections Officers received no training regarding being present during the examination of an inmate by a doctor. (see Pl. Exh. # 2, lines 9 to 14)

9.       During the examination, plaintiff was groped by Dr. Leveille.  (See Plaintiff's Second Amended Complaint at ¶ 12, annexed to Richardson Decl. as "Exhibit A"; Pl's Dep. at pp. 50:19-51:13). **Plaintiff #9**: Dr. Leveille rubbed his finger over the Plaintiff's nipple. (see Pl.

Deposition attached to Declaration of Victor M. Brown, Esq., as Exhibit 1 at page 51, line 10; Dr. Leveille did it again. (see Pl. Exh. 1, page 52, lines 3 and 4)

10.     After the examination, plaintiff was told to go out and get blood work done.  (See Pl's. Second Am. Compl. at ¶ 12; Pl's Dep. at pp. 53:18-24).

11.     Dr. Leveille did not accompany plaintiff to the lab where her blood work was to be completed.  (See Pl's Dep. at p. 54:11-15).

12.     On her way to the lab, plaintiff passed by a desk where an individual plaintiff believes to be named Correction Officer Moses sat.  (Id. at pp. 53: 25-54: 22).

13.     After plaintiff completed her blood work in the lab, she passed by Officer Moses' desk a second time.  (Id. at p. 57:13-15).

14.     After plaintiff completed her blood work, she heard Dr. Leveille say that he needed to "see Ms. Dickerson again" because she had "forgotten to sign something".  (See Pl's Dep. at pp. 57:16-58:5; Pl's Second Am. Compl. at ¶ 12). **Plaintiff's #14**)  Before the Plaintiff went in she was okay, but when she was done she was almost crying, with tears in her eyes. Plaintiff did not want to go back in there. (see Pl. Exhibit 1, Plaintiff's deposition at page 55, lines 1-6, line 13)

15.     Plaintiff did not tell Officer Moses what had happened to her.  (See Pl's Dep. at p. 58: 6-8). **Plaintiff's # 15**: The Plaintiff was scared to say no to anything in there. (see Pl. Exhibit 1, page 58, lines 12 and 13)

16.     Plaintiff never told Officer Moses that she didn't want to see Dr. Leveille again. (Id. at p. 58:9-14).  **Plaintiff's # 16**: The Plaintiff was scared to say no to anything to corrections personell. (see Pl. Exhibit 1, page 58, lines 12 and 13).  Dr. Leveille told the Plaintiff if she refused anything she would be placed on lockdown. (see Pl. Exh. #1 at page 47, lines 1 to 9)

17.     Plaintiff went back to see Dr. Leveille.  (Id. at 58:22-25). **Plaintiff's # 17**: Dr. Leveille told the Plaintiff that if she refused him anything she would be placed on lockdown. (see Pl. Exhibit 1 at page 47, lines 1 to 8) Dr. Leveille told the Plaintiff that she had to write down her telephone number. (see Pl. Exh.1 at page 176. lines 16-25)

18.     During the examination, plaintiff was again groped by Dr. Leveille. (See Pl's Second Am. Compl. at ¶ 12; Pl's Dep. at pp. 62: 10-63:6). **Plaintiff's # 18:** The Plaintiff was sitting there slunched over with tears in her eyes, trying to hold them in.  Dr. Leveille was cupping her breast, rubbing his thumb across. (see Pl. Exhibit 1, pages 62, lines 18 to 25, page 63, lines 1 to 6) Dr. Leveille moved the Plaintiff's nipple. (see Pl. Exhibit 1, page 171. line 1). Dr. Leveille was trying not to get caught. (see Pl. Exh. #1, page 53, lines 8 to 14)

19.     After the examination, Dr. Leveille told plaintiff she was done and she left the examination cubicle.  (See Pl's Dep. at p. 63: 11-16).  **Plaintiff's # 19**: The only people in the examination room were her and the doctor. (see Pl. Exh. 1, page 85, line 5)

20.     Plaintiff walked past Officer Moses' desk but did not say anything to her.  (Id. at pp. 63:17-64:10). **Plaintiff's #20**:  Plaintiff gave Officer Moses a look that indicated that before she went to see the doctor she was okay and when she got done in there she was almost crying. (see Pl. Exhibit 1, page 54, lines 23 to 25; page 55 lines 1 to 6)

21.     After plaintiff left the clinic she was placed in a cell to be housed.  (Id. at p 65: 9-18). **Plaintiff's # 21**: The Plaintiff cried all night about what had happened. (Id. at p 66: lines 1 and 2) The Plaintiff wanted Dr. Leveille to lose his job. (See Pl. Exh. 1, at page 21) The Plaintiff is no longer comfortable seeing doctors, and will not allow male doctors to examine her for her job.  (See Pl. Exhibit 1, page 85, lines 18 to 24)

22.     On the following day, October 18, 2009, plaintiff stayed in her cell for most of the day.  (Id. at p. 66: 3-17).

23.     On October 19, 2009, plaintiff was released from the custody of the New York City Department of Correction.  (See Pl's Dep. at p. 70:8-25; Pl's Second Am. Compl. at ¶ 16).

24.     Plaintiff was taken from her cell to the intake/outtake area.  (See Pl's Dep. at p. 72:2-8, 21-23).

25.     While plaintiff was in the intake/outtake area, she saw six or seven correction officers walking by.  (Id. at pp. 73: 13-74:6).

26.     At some point while she was in the intake/outtake area, plaintiff claims to have spoken to Correction Officer Farley.  (Id. at p. 74: 16-75:17). **Plaintiff's # 26**:  The Plaintiff told Defendant Officer Farley that Dr. Leveille touched her. (See Pl. Exhibit 1, page 75, lines 3 to 9)

27.     Plaintiff claims to have told Correction Officer Farley that she had "had an incident last night when I first got here with the doctor, and he kind of like touched me." (Id.) **Plaintiff's # 27**:  The Plaintiff told Defendant Officer Farley that Dr. Leveille touched her. (Id. at page 75, line 4).  Defendant Officer Farley did not recall any inmate complaining to her about a sexual assault committed by a doctor on October 19, 2009.(see Pl. Exhibit 2, Officer Farley Deposition at page 48, lines 7 to 21)

28.     Plaintiff claims Correction Officer Farley told her not to mention it and to report it to her local precinct once she got home.  (Id.) **Plaintiff's # 28**: Defendant Officer Farley told the Plaintiff not to mention the incident to anyone *else* at Rikers' Island at all. (see Pl. Exh. 2, page 75, lines 6 to 17) Defendant Officer Farley never received any training in reporting incidents where an inmate is complaining about a member of the Department of Corrections, or of an

assault being committed upon them by an employee of Defendant City. (see Pl. Exh. 2, Dep. of Def. Farley at page 48, lines 15 to 21, page 82, lines 3 to 7)

29.    Plaintiff claims she asked Correction Officer Farley if she should report it to the precinct around where she lives.  (Id. at p. 75: 21-25).  **Plaintiff's # 29**:  Defendant Officer Farley told the Plaintiff she could report the incident to any precinct. (see Pl. Exh. 1 at page 75, lines 24 and 25).

30.    Plaintiff claims Correction Officer Farley told her to report it to any precinct. (Id.)  **Plaintiff's # 30**:  Defendant Officer Farley told the Plaintiff she could report the incident to any precinct. (see Pl. Exh. 1 at page 75, lines 24 and 25). An inmate complaining about the conduct of a doctor at Rose M. Singer center is considered an "Incident" and corrections officers would be required to fill out an incident report, get a statement from the inmate and notify the area captain. (see Pl. Exhibit # 2, Farley Dep. at page 46, lines 11 to 23) Captain Carr was the captain that signed the Plaintiff's discharge checklist on October 19, 2009. (see Pl. Exhibit # 2, at page 44, line 25) Officer Farley has never had an inmate allege that a crime has been committed against them. (see Pl.Exh.2, Officer Farley Deposition at page 81, lines 7 to11)

31.    Plaintiff believed that Correction Officer Farley was giving her good information. (Id. at pp. 74:16-75:17).

32.    The day following plaintiff's release from Rikers, she had a court appearance. (Id. at p. 76: 9-13).

33.    After her court appearance, plaintiff went to the 60th precinct.  (Id. at p. 77: 4-9). **Plaintiff's # 33**:  The Plaintiff spoke with her sister-in-law about the incident, which caused her sister-in-law to cry. (see Pl. Exh.1, Pl Dep. at page 183, lines 3 to 8)

- 6 -

34.     At the precinct, plaintiff met with a helpful police officer whose name she does not remember.  (Id. pp. 78:23-79:11).

35.     The officer mentioned something about a precinct that handles incidents that take place at Rikers Island.  (Id.) Plaintiff's 35:  The officer at the 60th precinct was very upset about the situation and made a report, and instructed the Plaintiff. (see Pl. Dep. Exhibit #1 at page 77, line 9; page 79, lines 1 to 11

36.     The officer made a report.  (Id.)

37.     The officer gave plaintiff a phone number to call to get her complaint number. (Id.)

38.     Plaintiff called the precinct two or three days later, and the precinct told her that they didn't see a complaint report filed.  (Id. at p. 80: 2-17).

39.     Plaintiff also went back to the precinct on the same day she called.  (Id. at p. 80: 18-22).

40.     The officer who had originally taken plaintiff's complaint was off duty that day. (Id.)

41.     Plaintiff never went back to the 60th precinct.  (Id. at p. 81:20-22).

42.     Plaintiff never tried to call once the original officer was back on duty.  (Id. at p. 81:23-25).

43.     Plaintiff also contacted the 41st precinct after her first visit to the 60th precinct. (Id. at p. 82:1-11).

44.     Plaintiff learned that the 41st precinct was located in the Bronx.  (Id.)

45.     Plaintiff did not feel like going all the way to the Bronx.  (Id.)

46.     After her second visit to the 60th precinct, plaintiff never contacted anyone from the NYPD again.  (Id. at p. 82:12-14).

47.     Plaintiff did not file a complaint with another city agency regarding this incident. (Id. at p. 82:15-20). **Plaintiff's # 47**: The Plaintiff was interviewed by a prosecutor concerning the incident. (see Pl. Exhibit 1, page 83, lines 12 to 24)

48.     On October 21, 2009, a complaint report was taken by Police Officer Emanuel at the 60th precinct.  (See Omniform System Complaint Report, annexed to Richardson Decl. as "Exhibit E", at p. 1).

49.     The complaint report was forwarded to the 41st precinct.  (Id.)

50.     A duplicate report was generated on December 12, 2009.  (Id.)

51.     On December 14, 2009, Detective Velez conferred with the New York City Department of Investigation, and was informed that plaintiff's case was being investigated by the Inspector General.  (See Complaint Follow-up Report, annexed to Richardson Decl. as "Exhibit F").

52.     The PHS defendants are private corporations who have contracted with defendant City to provide and administer medical services inside DOC facilities.  (See Excerpts from PHS Contract, annexed to Richardson Decl. as "Exhibit G").

53.     Under the terms of the contract, the PHS defendants are responsible for hiring physicians according to certain guidelines.  (Id. at pp. NYC 93-98.) **Plaintiff's # 53**:  Under the definition term of the contract between PHS and Defendant City applicable laws, Defendant City and PHS are required to abide by include the New York State Correction Law and all applicable laws of the United States. (see Def. Exhibit G at page 7)

54.     The contract that was in effect between defendant City and the PHS defendants in October 2009 was a renewal contract, premised upon the fact that the PHS defendants had successfully performed their obligations under a previous contract.   (Id. at p. NYC 42.)

**Plaintiff's # 54**: According to the contract between Defendant City and PHS, Defendant City has sole discretion in electing to increase staffing at the clinics operated in correctional facilities. (see Defendant Exhibit G at page 16)

Dated: New York, New York
          May 19, 2011


_____
VICTOR M. BROWN, ESQ.

Attorney for Plaintiff

11 Park Place, Suite 600
New York, New York 10007
(212) 227-7373

TO: <u>BY ECF</u>
Office of Corporation Counsel
*Attorney for Defendant City of New York, NYC Department of Corrections*
*NYC Corrections Officer Latrisha Farley*
100 Church Street
New York, NY 10007

<u>BY ECF</u>
John J. Barbera Esq.
*Attorney for Defendant Dr. Leveille*
Martin Clearwater & Bell LLP
245 Main Street
White Plains, New York 10601

<u>BY ECF</u>
Christina La Marca, Esq.
*Attorney for PHS, Inc., and PHS, P.C.*
Kaufman, Borgeest, & Ryan LLP
120 Broadway, 14th Floor
New York, NY 10271

Index No. 10 CV 4620 (BMC)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NAHAJEHA DICKERSON

Plaintiff,

-against-

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF CORRECTIONS, PRISON HEALTH
SERVICES, INC. (PHS), PHS MEDICAL SERVICES, P.C.,
DR. FRANCK LEVEILLE, NEW YORK CITY
CORRECTIONS OFFICER LATISHA FARLEY, Shield #
18331,

Defendants.

**NOTICE OF MOTION
RULE 56.1 STATEMENT
DECLARATION OF VICTOR M. BROWN, ESQ. IN
SUPPORT OF PLAINTIFFS' OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

*Victor M. Brown, Esq.*
*Attorney for Plaintiff Nahajha Dickerson*
*11 Park Place, Suite 600*
*New York, New York  10007*
*Tel:  (212)227-7373*

*Due and timely service is hereby admitted.*

*New York, N.Y.............................................................. , 201..*

*........................................................................... Esq.*

*Attorney for.............................................................................*

Filename:           Dickerson R56.1, Def Statment of Facts
Directory:          C:\Documents and Settings\Victor M. Brown\My
       Documents
Template:           C:\Documents and Settings\Victor M. Brown\Application
       Data\Microsoft\Templates\Normal.dot
Title:
Subject:
Author:             FirstName LastName
Keywords:
Comments:
Creation Date:      5/6/2011 4:08:00 PM
Change Number:      9
Last Saved On:      5/19/2011 6:32:00 PM
Last Saved By:      Victor Brown
Total Editing Time: 288 Minutes
Last Printed On:    5/19/2011 6:36:00 PM
As of Last Complete Printing
       Number of Pages: 12
       Number of Words:       2,669 (approx.)
       Number of Characters:  12,867 (approx.)